Filed 10/2/15

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE ex rel. KAREN ROSS, as Secretary of the Department of Food and Agriculture,<br><br>        Plaintiff, Cross-defendant and Appellant,<br><br>    v.<br><br>RAISIN VALLEY FARMS LLC et al.,<br><br>        Defendants, Cross-complainants and Respondents. | C074569<br><br>(Super. Ct. Nos.<br>34-2010-00067624-CU-MC-GDS,<br>34-2011-00106058-CU-MC-GDS) |
| LION RAISINS, INC., et al.,<br><br>        Plaintiffs and Appellants,<br><br>    v.<br><br>KAREN ROSS, as Secretary of the Department of Food and Agriculture,<br><br>        Defendant and Appellant. | C074621<br><br>(Super. Ct. Nos.<br>02AS01618, 03AS05313)<br><br>[CONSOLIDATED WITH] |
| BOGHOSIAN RAISIN PACKING CO., | |

1

INC., et al.,

        Plaintiffs and Respondents,

      v.

KAREN ROSS, as Secretary of the
Department of Food and Agriculture,

        Defendant and Appellant.

APPEAL from a judgment of the Superior Court of Sacramento County, Raymond M. Cadei, Judge.  Reversed with directions.

Kamala D. Harris, Attorney General, Robert W. Byrne, Assistant Attorney General, Randy L. Barrow, G. Lynn Thorpe and Linda Gandara, Deputy Attorneys General, for Plaintiff, Cross-defendant and Appellant and for Defendant and Appellant, The People ex rel., Karen Ross, etc.

Kahn Soares & Conway, George H. Soares and Ann M. Grottveit for California Rice Commission, California Apple Commission, California Grape Rootstock Improvement Commission, California Date Commission and California Cut Flower Commission as Amici Curiae on behalf of Appellant, The People ex rel., Karen Ross, etc.

Law Offices of Brian C. Leighton and Brian C. Leighton for Defendants, Cross-complainants and Respondents, Raisin Valley Farms LLC, Marvin D. Horne, Laura R. Horne and Lassen Vineyards, Inc.

Joseph H. Boyd for Plaintiffs and Appellants, Lion Raisins, Inc., and Lion Farms LLC.

Sagaser, Watkins & Wieland and Howard A. Sagaser for Plaintiffs and Respondents, Boghosian Raisin Packing Co., Inc., Boghosian Brothers and Philip Boghosian.

We conclude here that while the California Marketing Act of 1937 (the CMA; Food & Agr. Code, § 58601 et seq.) may have its roots in the Great Depression, it also has branches that extend to the contemporary world of agriculture.[1]

This case involves the raisin industry.[2] One of the CMA's requirements is that the Secretary of California's Department of Food and Agriculture (the Secretary; the Department), in adopting a marketing order for industry advertising or research, must find that the order "will tend to effectuate the declared purposes and policies of [the CMA]." (§ 58813, subd. (b).) The trial court (1) concluded that this requirement could be met *only if* "the [o]rder was necessary to address adverse economic conditions in the raisin-growing industry that were so severe as to threaten the continued viability of the industry"; (2) invalidated the advertising and research marketing order challenged here because there was insufficient evidence showing such economic conditions; and (3) found, on these same grounds, that the Department improperly exercised the police power in adopting the marketing order.

We find the trial court's interpretation of this requirement of the CMA, which Karen Ross, the Secretary, appeals, erroneously limits the CMA's applicability, as to marketing orders for industry advertising or research, only to Great Depression-like economic circumstances. Consequently, we shall reverse the judgment, which moots the cross-appeal of Lion Raisins, Inc., and Lion Farms LLC (formerly Lion Brothers) (the cross-appeal concerns the proper calculation of the assessment refund for the invalidated

---

[1] Undesignated statutory references are to the Food and Agricultural Code.

[2] The trial court referred to the raisin growers (producers) and packers/distributors (handlers) involved in the consolidated proceedings before it—Raisin Valley Farms LLC et al., Lion Raisins, Inc., et al., and Boghosian Raisin Packing Co., Inc., et al.—as "plaintiffs." We shall do the same, except where it may be necessary to identify any one of them individually.

marketing order), and remand the matter for the trial court to consider the other challenges to the marketing order that the raisin companies raise.

## BACKGROUND

### *Legal Background*

The CMA and its federal counterpart, the Agricultural Marketing Agreement Act of 1937 (the federal Act; 7 U.S.C. § 601 et seq.), are statutory programs rooted in the legislative judgment that governmental intervention in agricultural markets was necessary to preserve the agricultural industry, especially during the Great Depression. (See *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 478 (*Gerawan I*), remanded and review granted a second time in *Gerawan Farming, Inc. v. Kawamura* (2004) 33 Cal.4th 1, 7 (*Gerawan II*).) Before the CMA, many of California's fruit and vegetable growers attempted to be the first to market, to secure the premium prices paid on early shipments. This " 'unregulated scramble' " had an adverse effect upon growers and consumers, resulting in what we would call today a "race to the bottom" in both quality and pricing, to the detriment of the whole industry and the consuming public. (*Gerawan II*, at p. 7; *Voss v. Superior Court* (1996) 46 Cal.App.4th 900, 907.) The CMA "constitutes a legislative entrustment of the power to regulate the marketing of agricultural commodities to those who produce or otherwise deal with such products, subject to the approval of the [S]ecretary." (*Voss*, *supra*, at p. 907.)

Like the federal Act, the CMA declares, as one of its policies, the establishing and maintaining of orderly marketing conditions for agricultural commodities in order to raise and support prices for their producers. (*Gerawan I*, *supra*, 24 Cal.4th at p. 478.) To effectuate this policy, the CMA, like the federal Act, authorizes the Secretary (formerly, the California Director of Agriculture) to issue "marketing orders" (i.e., regulations) that govern, among other things, the timing and quantity of agricultural products marketed, and that provide for participation in the administration of such orders by the regulated

4

growers (producers) and packers/distributors (handlers) themselves that amounts to self-regulation. (*Gerawan I*, at pp. 478-479.)

But, unlike the federal Act, the CMA authorizes the Director of Agriculture (now, the Secretary) to impose marketing orders for industry advertising or sales promotion to create new or larger markets for particular agricultural commodities; specifically, orders toward increasing the sale of such commodity without reference to a particular brand. (*Gerawan I*, *supra*, 24 Cal.4th at p. 479; Stats. 1937, ch. 404, § 1, pp. 1335-1336.) The CMA requires that the regulated producers and handlers subject to such a marketing order contribute an assessment to cover related expenses. (*Gerawan I*, *supra*, at p. 479.) The procedure for adopting such an order involves an application by producers and/or handlers, notice and a public hearing by the Department, and a supermajority approval by those subject to the order (the order is repealable every five years, and may be repealed earlier by those subject to it).

"Since 1937, the Legislature has amended the CMA on several occasions. As a general matter, the CMA has retained the core of the provisions described above, but has expanded beyond their periphery." (*Gerawan I*, *supra*, 24 Cal.4th at p. 479.) One such expansion is worthy of brief mention here (and greater note later). In 1945, the Legislature amended the CMA to divide marketing orders between those that restrict commodity supply and those that do not. The marketing orders that restrict supply require economic findings concerning the correlation of supply and demand and a particular level of producer purchasing power, as well as the consideration of particular economic factors (if relevant). The marketing orders that do not restrict supply (which include marketing orders for advertising or research, like the order at issue here) do not specifically require these findings or the consideration of these factors. (§§ 58811-58813; Stats. 1945, ch. 517, § 5, pp. 1031-1032.)

5

*Factual and Procedural Background*

A few years after the end, in 1994, of the iconic promotional campaign of the California Dancing Raisins (to the tune, "I Heard It Through the Grapevine"),[3] some in the raisin industry thought a new promotional campaign (with a research component) was needed to address the recurring issue of too much supply and too little demand.

So, pursuant to the procedure described above of application, public hearing, and supermajority approval, the Department, in 1998, adopted the California Raisin Marketing Order (the Order) pursuant to the CMA. The Order authorizes a research and promotional program for California raisins. This program is administered by a board of raisin growers (the Raisin Board), overseen by the Department, and funded by an assessment of 2 percent of the field price on each ton of raisins delivered to packers.

In the consolidated lawsuits at issue here, plaintiffs sued the Department in complaints and cross-complaints for declaratory and injunctive relief. (See fn. 2, *ante*.) Plaintiffs allege the Order is invalid on grounds of free speech, free association, constitutional liberty interests, the police power, inconsistency with the CMA, and violations of the Order itself. Plaintiffs want their assessments—going back to the 1998-1999 crop year—back.

Following a bench trial, the trial court granted judgment for plaintiffs on a narrow ground—based on an interpretation of the CMA—that was not explicitly alleged in the pleadings, but that was covered in posttrial briefing (and which resulted in a favorable ruling on plaintiffs' police power claim as well). The trial court concluded the Order is invalid because the evidence did not show the Order "was necessary to address adverse

---

[3] Song by Marvin Gaye released in 1968.

economic conditions in the raisin-growing industry that were so severe as to threaten the continued viability of the industry."**4**

The Department then appealed. The cases have remained consolidated for appeal.

## DISCUSSION

### I. The Trial Court's Decision

Section 58813 sets forth the administrative findings the Secretary is required to make to adopt a marketing order that does not restrict quantity (i.e., does not restrict the supply of the agricultural commodity at issue), like the Order here for industry advertising and research. As relevant, one of those required findings is that the marketing order "will tend to effectuate the declared purposes and policies" of the CMA. (§ 58813, subd. (b).)

In its decision, the trial court looked to the legislative findings of the CMA (which include declarations), set forth in section 58651. Reasoning that those findings and declarations describe conditions of severe economic crisis, the trial court found that "the declared purposes and policies" of the CMA—which are explicitly declared in sections 58654 and 58652, respectively—are to address "conditions of severe crisis that threaten economic collapse." Based on this statutory interpretation, the trial court concluded: "The . . . adoption and approval of the . . . Order . . . was invalid as a matter of law because the [Secretary's] finding that the Order would tend to effectuate the declared purposes and policies of the [CMA] was not supported by substantial evidence.

---

**4** It bears emphasizing that this appeal does not involve any constitutional issues, such as free speech, free association, or a taking without just compensation. It does not involve the wisdom of any particular economic theory or ideology. It does not involve the question whether particular varieties of raisins (e.g., Thompson Seedless versus Selma Pete) or production methods (e.g., dried-on-ground versus dried-on-vine) have been shortchanged in the Order's advertising or research campaign. It involves only whether the trial court's above stated interpretation of the CMA is correct.

7

Specifically, there was no evidence that the California raisin-growing industry was suffering from the type of severe economic crisis the [CMA] was intended to address, [i.e.,] that governmental intervention into the agricultural industry was necessary to preserve the raisin-growing industry from destruction, to maintain the purchasing power of producers, or to protect the food supply of the people of this state."

## II. The Statutes to Be Interpreted

As just noted, the trial court's decision involves an interpretation of sections 58813 (required administrative findings for an order *not restricting* supply), 58651 (the CMA's findings and declarations), 58652 (the CMA's policies), and 58654 (the CMA's purposes). To this statutory array we add section 58811 (required administrative findings for an order *restricting* supply), and its statutory companion, section 58812 (consideration of economic factors), which serve as a comparison to section 58813. We will now set forth the pertinent provisions of these statutes in the order listed.

### Section 58813

Section 58813 (required administrative findings for an order *not restricting* supply) states:

"If the marketing order . . . contain[s] . . . provisions for advertising or sales promotion, or for research, the [Secretary] may issue such marketing order . . . if he [or she] makes all of the following findings:

"(a) That such marketing order . . . [is] reasonably calculated to attain the objectives which are sought in such marketing order.

"(b) That such marketing order . . . [is] in conformity with the provisions of [the CMA] and within the applicable limitations and restrictions which are set forth in [the CMA] and *will tend to effectuate the declared purposes and policies* of [the CMA].

8

"(c) That the interests of consumers of such commodity are protected in that the powers of [the CMA] are being exercised only to the extent which is necessary to attain such objectives." (Italics added; as to the requirement that advertising generally be generic, see § 58889.)

### Section 58651

Section 58651 (legislative findings and declarations) provides:

"It is hereby declared that the marketing of commodities in this state in excess of reasonable and normal market demands therefor; disorderly marketing of such commodities; improper preparation for market and lack of uniform grading and classification of commodities; unfair methods of competition in the marketing of commodities; and the inability of individual producers to maintain present markets or to develop new or larger markets for California-grown commodities, results in an unreasonable and unnecessary economic waste of the agricultural wealth of this state.

"Such conditions and the accompanying waste jeopardize the future continued production of adequate supplies of food, fiber, and other products of the farm and of the soil for the people of this and other states, and prevent producers from obtaining a fair return from their labor, their farms, and the commodities which they produce.

"As a consequence, the purchasing power of such producers has been in the past, and may continue to be in the future, unless such conditions are remedied, low in relation to that of persons engaged in other gainful occupations within the state. Producers are thereby prevented from maintaining a proper standard of living and from contributing their fair share to the support of the necessary governmental and educational functions, thus tending to increase unfairly the tax burdens of other citizens of this state."

### Section 58652

Section 58652 (the CMA's policies) states:

9

"These conditions [(i.e., the conditions described in section 58651)] vitally concern the health, peace, safety, and general welfare of the people of this state. It is hereby declared to be the policy of this state to aid producers in preventing economic waste in the marketing of their commodities, to develop more efficient and equitable methods in the marketing of commodities and to aid producers in restoring and maintaining their purchasing power at a more adequate, equitable and reasonable level.

*Section 58654*

Section 58654 (the CMA's purposes) provides:

"The purposes of [the CMA] are to do the following:

"(a) Enable producers of this state, with the aid of the state, to correlate more effectively the marketing of their commodities with market demands for those commodities.

"(b) Establish orderly marketing of commodities.

"(c) Provide for uniform grading and proper preparation of commodities for market.

"(d) Provide methods and means for the maintenance of present markets, or for the development of new or larger markets, for commodities that are grown within this state or for the prevention, modification, or elimination of trade barriers that obstruct the free flow of those commodities to market.

"(e) Eliminate or reduce economic waste in the marketing of commodities.

"(f) Restore and maintain adequate purchasing power for the producers of this state.

"(g) Inform the general public of the processes of producing agricultural commodities.

10

"(h) Foster cooperation and understanding between urban and rural sectors of society."

**Section 58811**

Section 58811 (required administrative findings for an order *restricting* supply) states:

"[B]efore issuing a marketing order . . . which contain[s] provisions for correlating the supply of the commodity . . . with market demands for it by means of restrictions upon the total quantity of such commodity, or restrictions upon the total quantity of any grade, size, quality, or condition of it, which restrictions have the effect of limiting the total quantity of such commodity which may be marketed during any marketing season, if the restricted portion of such commodity might otherwise be marketed by producers . . . , the [Secretary] shall make all of the following findings with respect to such marketing order . . . :

"(a) Such provisions are necessary in order to effect a reasonable correlation of the supply of the commodity . . . with market demands for the commodity and that such marketing order . . . will tend to reestablish or maintain such level of prices for such commodity as will provide a purchasing power for such commodity which is adequate to maintain in the business of producing such commodity such number of producers as is required to provide such supply of the quantities and qualities of such commodity as is necessary to fulfill the normal requirements of consumers of the commodity.

"(b) Such marketing order . . . will tend to approach such equality of purchasing power at as rapid a rate as is feasible in view of the market demand for such commodity.

"(c) Such marketing order . . . [is] in conformity with the provisions of [the CMA] and within the applicable limitations and restrictions which are set forth in [the CMA] and will tend to effectuate the declared purposes and policies of [the CMA].

11

"(d) Such marketing order . . . will protect the interests of consumers of such commodity, by exercising the powers of [the CMA] only to such extent as is necessary to establish the equality of purchasing power which is described in subdivision (a) of this section."

*Section 58812*

And, finally, section 58812 (consideration of economic factors), section 58811's companion statute, provides:

"In making the findings with respect to any of the objectives which are set forth in Section 58811, the [Secretary] shall, if any or all of the following economic factors are relevant, take into consideration any and all facts which are available to him [or her] with respect to all of the following:

"(a) The quantity of such commodity which is available for distribution.

"(b) The quantity of such commodity which is normally required by consumers.

"(c) The cost of producing such commodity as determined by available statistics and surveys.

"(d) The purchasing power of consumers as indicated by reports and indices.

"(e) The level of prices of other commodities which compete with, or are utilized as substitutes for, such commodity.

"(f) The level of prices of other commodities, services, and articles which farmers commonly buy."

### III.  The Interpretation of the Statutes

"Our objective in interpreting a statute is to determine legislative intent so as to effectuate the law's purpose.  The first thing we do is read the statute, and give the words their ordinary meanings unless special definitions are provided.  If the meaning of the

12

words is clear, then the language controls; if not, we may use various interpretive aids," including, as we will use here, legislative history. (*Schnyder v. State Bd. of Equalization* (2002) 101 Cal.App.4th 538, 545, fns. omitted; *Department of Fish & Game v. Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554, 1562.) [5]

For several reasons, we disagree with the trial court's interpretation of the section 58813, subdivision (b) phrase "will tend to effectuate the declared purposes and policies" of the CMA. The trial court interpreted the phrase to mean that the Department cannot adopt a marketing order under the CMA for industry advertising or research unless that order is necessary to address adverse economic conditions in the affected agricultural industry that are so severe as to threaten the continued viability of the industry. [6]

First, the language of the CMA's pertinent statutes, set forth above, does not mention this standard and is not confined to it. Section 58813 states that a marketing order which does not restrict commodity supply, such as an order for industry advertising or research, must "tend to effectuate the declared purposes and policies" of the CMA. (§ 58813, subd. (b).) Those purposes are declared in section 58654, and they include to "[e]nable producers . . . , with the aid of the state, to correlate more effectively the marketing of their commodities with market demands for those commodities"; to "[p]rovide methods and means for the maintenance of present markets, or for the development of new or larger markets . . . "; and to "[r]estore and maintain adequate purchasing power for . . . producers . . . ." (§ 58654, subds. (a), (d), (f).) Those policies

---

[5] We grant the Department's request for judicial notice of the CMA's legislative history.

[6] We also note, at the outset, that even plaintiffs implicitly agree on appeal that the cases the trial court relied upon for its interpretation—*Gerawan II*, *supra*, 33 Cal.4th at p. 7; *People v. Western Fruit Growers, Inc.* (1943) 22 Cal.2d 494; *Agricultural Prorate Commission v. Superior Court* (1936) 5 Cal.2d 550; *People v. Asamoto* (1955) 131 Cal.App.2d 22—are not pivotal to that interpretation. These cases either did not involve the CMA or the interpretation issue before us.

13

are declared in section 58652, and they include "to develop more efficient and equitable methods in the marketing of commodities and to aid producers in restoring and maintaining their purchasing power . . . ."[7]

Second, even if the legislative findings and declarations of section 58651—the bulk of which were made in 1937 during the Great Depression—can be read to support the narrow standard adopted by the trial court, and therefore to create a statutory ambiguity, a critical amendment to the CMA in 1945 clears things up.

As originally enacted in 1937, the CMA required the Secretary (then called the Director) to make the same set of findings for every marketing order; most critically, that the order would tend to reestablish or maintain a particular level of producer purchasing power tied to a specified base period. (Stats. 1937, ch. 404, § 1, p. 1332; former Agr. Code, § 1300.14, subd. (a)(1).) In making this finding, the Secretary was required to consider six specific economic factors: the supply of the commodity, the demand for it, the cost of production, the purchasing power of consumers, the prices of competing or substitute commodities, and the prices farmers pay for the items they commonly buy. (Stats. 1937, ch. 404, § 1, p. 1333; former Agr. Code, § 1300.14, subd. (b)(1)-(6).)

In 1945, the Legislature divided marketing orders into two camps: those that restrict the supply of a commodity (i.e., restrict quantity), and those that do not. (Stats. 1945, ch. 517, § 5, pp. 1031-1032; former Agr. Code, § 1300.14, subds. (a), (c).)

Pursuant to the 1945 legislation, for marketing orders that restrict commodity supply, the Secretary had to find, most significantly, that the order was "necessary" to effect a reasonable correlation of supply and demand and that the order would tend to

---

[7] Reasonably, no plaintiff suggests that a marketing order must tend to effectuate all purposes and/or all policies, something that would not be practicable. (See §§ 58652, 58654.)

14

reestablish or maintain a defined level of producer purchasing power. (Stats. 1945, ch. 517, § 5, at p. 1031; former Agr. Code, § 1300.14, subd. (a)(1).) In making these findings, the Secretary was required to consider the same six economic factors specified in the 1937 CMA, if relevant. (Stats. 1945, ch. 517, § 5, at p. 1032; former Agr. Code, § 1300.14, subd. (b)(1)-(6).)

For marketing orders that do not restrict commodity supply—including orders for advertising, sales promotion, or research—the 1945 legislation did *not require* explicitly the Department (1) to find that the order is "necessary" to effect a reasonable correlation of supply and demand, (2) to make a finding regarding a defined level of producer purchasing power, or (3) to consider the six specific economic factors. (Stats. 1945, ch. 517, § 5, at p. 1032; former Agr. Code, § 1300.14, subd. (c)(1)-(3).) Instead, the Secretary had to find that the nonrestricting order would "tend to effectuate the declared purposes and policies" of the CMA (Stats. 1945, ch. 517, § 5, at p. 1032; former Agr. Code, § 1300.14, subd. (c)(2)), and to make similar generalized findings of accordance with the CMA.[8]

The 1945 language and distinction between marketing orders that restrict commodity supply and those that do not is carried forward to the present today in sections 58811 (required findings for order restricting quantity), 58812 (section 58811's companion, specifying the six economic factors to be considered if relevant), and 58813 (required findings for order not restricting quantity).

Third, the trial court's interpretation of the CMA would call into question dozens of promotional campaigns for California agricultural commodities. The Order is just one of approximately 50 agricultural marketing programs the Department currently oversees.

---

[8] The 1945 legislation also imposed similar generalized finding requirements on marketing orders restricting quantity. (Stats. 1945, ch. 517, § 5, p. 1031; former Agr. Code, § 1300.14, subd. (a)(3).)

Without citing any authority, plaintiffs contend that when the Legislature now wants to implement a promotional program for a particular agricultural industry—but the adverse economic conditions required under the CMA for establishing boards (such as the Raisin Board here) do not exist—the Legislature does so by specifically targeted, "modern" legislation that establishes commodity-based commissions or councils (e.g., California Table Grape Commission, California Apple Commission).  A review of the California Table Grape Commission's enabling legislation, however, shows that commissions/councils under the "modern" legislation, and boards under the CMA, speak much the same substantive language to address much the same issues.  (See § 65500 et seq.).

This third reason leads to our fourth.  The Department has interpreted the CMA as authorizing the adoption of industry advertising or research marketing orders, like the Order here, without the presence of severe adverse economic conditions that threaten the affected industry's continued viability.  "Generally, we extend considerable deference to an administrative agency's interpretation of . . . the regulatory scheme which the agency implements or enforces.  The agency interpretation is entitled to great weight unless unauthorized or clearly erroneous."  (*Communities for a Better Environment v. State Water Resources Control Bd.* (2003) 109 Cal.App.4th 1089, 1107.)  Given our examination above of the CMA's language and legislative history, we do not find the Department's interpretation unauthorized or clearly erroneous.

Fifth, and lastly, even plaintiffs show some discomfort with the trial court's "severe" interpretation of the CMA.  They refer to that interpretation, at several points in their briefing, as requiring merely "significant" or "substantial," rather than "severe," adverse economic conditions.

## IV.  Conclusion

We conclude the trial court erred in interpreting the provision of the CMA that requires that a marketing order for industry advertising or research "tend to effectuate the declared purposes and policies of [the CMA]."  (§ 58813, subd. (b).)  The trial court concluded that this requirement could be met *only if* "the [o]rder was necessary to address adverse economic conditions in the raisin-growing industry that were so severe as to threaten the continued viability of the industry."  That interpretation is too narrow.  Consequently, we also conclude the trial court erred in finding, based on this interpretation, that there was insufficient evidence showing such economic conditions, and that the Department improperly exercised the police power in adopting the marketing order.

## DISPOSITION

The judgment is reversed.  Plaintiffs' consolidated cross-appeal is dismissed as moot.  The matter is remanded to the trial court for further proceedings consistent with this opinion.  The Department is awarded its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)  (***CERTIFIED FOR PUBLICATION***)


                                                                   BUTZ              , J.

We concur:



         RAYE              , P. J.



         ROBIE             , J.


17