Filed 5/25/21

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| LION RAISINS, INC., et al., | C086205 |
| Plaintiffs and Appellants, | (Super. Ct. Nos. 02AS01618 & 03AS05313) |
| v. | |
| KAREN ROSS, as Secretary, etc., | |
| Defendant and Respondent. | |
| | |
| THE PEOPLE ex rel. KAREN ROSS, as Secretary, etc., | C086206 |
| Plaintiff, Cross-defendant and Respondent, | (Super. Ct. Nos. 34-2010-00067624-CU-MC-GDS & 34-2011-00106058-CU-MC-GDS) |
| v. | |
| RAISIN VALLEY FARMS, LLC, et al., | |
| Defendants, Cross-complainants and Appellants. | |

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I, II, V, VI and VII.

1

APPEALS from judgments of the Superior Court of Sacramento County, Raymond M. Cadei, Judge.  Case No. C086205 dismissed.  Case No. C086206 affirmed as modified.

Bertram T. Kaufmann; Law Offices of Brian C. Leighton and Brian C. Leighton for Plaintiffs and Appellants in Case No. C086205.

Law Offices of Brian C. Leighton and Brian C. Leighton for Defendants and Appellants in case No. C086206.

Xavier Becerra, Attorney General, Robert W. Byrne, Assistant Attorney General, Randy L. Barrow, Ali A. Karaouni, and Linda Gandara, Deputy Attorneys General for Defendant and Respondent in case No. C086205 and Plaintiff and Respondent in case No. C086206.


This appeal concerns a California Raisin Marketing Order (the Marketing Order) first issued in 1998 by the California Department of Food and Agriculture (the Department) under the California Marketing Act of 1937 (Food & Agr. Code, § 58601 et seq.) (the CMA).[1]  The Marketing Order establishes a "California Raisin Marketing Board" (the Board) and authorizes the Board to engage in research and promotional activities to aid producers in reducing the costs of production and increasing demand for California raisins.  In accordance with the CMA, the Marketing Order is administered by the Department and funded by mandatory assessments imposed on California raisin producers.

The present appeal arises from two cases consolidated for purposes of trial.  The first case, *Lion Raisins, Inc., et al. v. Ross*, case No. C086205, involves a complaint for declaratory and injunctive relief filed by Lion Raisins, Inc., et al. (collectively, Lion). The Lion complaint, which challenges the validity of the Marketing Order on a wide range of issues, seeks a declaration that the Marketing Order is unconstitutional and

---

[1]     Undesignated statutory references are to the Food and Agricultural Code.

2

invalid, an injunction against future assessments, and a refund of all assessments paid since the 1999-2000 crop year.

The second case, *People ex rel. Ross v. Raisin Valley Farms, LLC, et al.*, case No. C086206, involves a complaint filed by the Department against Raisin Valley Farms, LLC, et al. (collectively, Raisin Valley), to recover unpaid assessments, and a related cross-complaint against the Department for declaratory, injunctive, and compensatory relief.[2]  Similar to the Lion complaint, the Raisin Valley cross-complaint challenges the validity of the Marketing Order on multiple grounds.

The trial court initially entered judgment against the Department on the consolidated cases, concluding the Marketing Order was invalid because there was insufficient evidence that the Marketing Order was necessary to address severe economic conditions in the raisin industry.  (*People ex rel. Ross v. Raisin Valley Farms LLC* (2015) 240 Cal.App.4th 1254, 1259 (*Ross*).)  The Department appealed and we reversed, concluding the trial court's interpretation of the CMA was too narrow.  (*Ross, supra*, at p. 1267.)  We remanded the matter to the trial court for further proceedings consistent with our opinion.  (*Ibid.*)

On remand, after additional briefing, the trial court entered judgments in favor of the Department, denying the challenges to the Marketing Order.  Lion and Raisin Valley appeal from those judgments, asserting numerous errors.  First, appellants contend the court erred in rejecting their claim that the Board's promotional activities violated the "varietal benefit" and "non-disparagement" provisions of the Marketing Order.  Second, appellants contend the court erred in concluding that the Raisin Bargaining Association (the RBA) was lawfully allowed to bloc vote as a cooperative marketing association in

---

[2]     The Raisin Valley action, originally filed in Fresno County, was later transferred to Sacramento County, where it was consolidated with another enforcement action filed by the Department against successor entities to the original Raisin Valley parties.

referendums to approve the Marketing Order.  Third, they contend the court erred in concluding that the bloc-voting provisions of the CMA are constitutional.  Fourth, they contend that the court erred in allowing the Department to abandon its "cornerstone" finding for the Marketing Order which, they argue, was not supported by the evidence. Fifth, they contend the court erred in concluding the Department had no duty to consider reasonable alternatives before adopting the Marketing Order.  And finally, they contend the court erred in rejecting their claim that the Marketing Order violates their constitutional rights to free speech and free association.

With regard to the appeal in the Lion case, we shall modify the judgment to dismiss the "varietal benefit" and "non-disparagement" claims due to appellants' failure to exhaust administrative remedies, and affirm the judgment as modified.  We dismiss the appeal in the Raisin Valley case as premature under the one final judgment rule.

BACKGROUND LAW

The CMA and its federal counterpart, the Agricultural Marketing Agreement Act of 1937 (7 U.S.C. § 601 et seq) (the AMAA), were legislative responses to severe problems encountered by the agricultural industry during the Great Depression.  (*Ross, supra*, 240 Cal.App.4th at p. 1257; see also *Lion Raisins, Inc. v. United States* (Fed. Cir. 2005) 416 F.3d 1356, 1358.)  The programs were rooted in the legislative judgment that governmental intervention was necessary to preserve the agricultural industry.  (*Ross*, at p. 1257.)

In enacting the CMA, the Legislature found that there was " 'unreasonable and unnecessary economic waste' " of California's agricultural wealth due to, among other things, disorderly marketing of commodities, unfair competition in the marketing of commodities, and the inability of producers to maintain present markets or develop new or larger markets for California-grown commodities.  (*Voss v. Superior Court* (1996) 46 Cal.App.4th 900, 907 (*Voss*); § 58651.)  According to the Legislature, such conditions "jeopardize the future continued production of adequate supplies of food . . . and prevent

4

producers from obtaining a fair return from their labor . . . ." (§ 58651.) Thus, in enacting the CMA, the Legislature declared its intent to aid producers in preventing economic waste, developing more efficient and equitable methods of marketing commodities, and restoring and maintaining their purchasing power at a more adequate, equitable, and reasonable level. (§ 58652.)

To effectuate its purposes, the CMA authorizes the Secretary of the Department (formerly the Director of Agriculture of the State of California) to enter into " 'marketing agreements' " and issue " 'marketing orders.' "[3] (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 478-479.) A "marketing agreement" is a contract-like arrangement binding only upon the signatories to the agreement, which governs the marketing and handling of such commodity. (*Id*. at p. 478; § 58745.) A "marketing order," in contrast, regulates all persons engaged in the marketing, processing, distributing, or handling of the commodity. (*Gerawan Farming, supra*, at pp. 478-479; §§ 58615, 58712, 58741, 58743, 58881.)

The CMA authorizes marketing orders that control, among other things, the quantity or quality of any commodity produced for market. (*Ross, supra*, 240 Cal.App.4th at p. 1257; §§ 58881-58888; 7 U.S.C. § 608c(6).) The CMA also separately authorizes marketing orders that establish "plans for advertising and sales promotion to maintain present markets or to create new or larger markets for any commodity . . . ." (§ 58889, subd. (a); *Ross*, at p. 1257.)

The CMA provides that any advertising or promotional plan must be generic and "directed toward increasing the sale of the commodity without reference to any private brand or trade name that is used by any handler with respect to the commodity regulated by the marketing order . . . ." (§ 58889, subd. (b).) The CMA prohibits advertising or

---

[3] For simplicity, we hereafter refer to both the Department and its Secretary collectively as "the Department."

5

sales promotion programs that make "false or unwarranted claims in behalf of any product, or disparages the quality, value, sale, or use of any other commodity." (§ 58889, subd. (d).)

Funding of a marketing order comes from the producers or handlers directly affected by it. (*Ross, supra*, 240 Cal.App.4th at pp. 1257-1258.) The CMA gives the Department the power to levy and collect from each affected producer or handler an assessment calculated to defray the costs of the order. (§§ 58921, 58925, 58926, 58929.)

The CMA describes the procedure for adopting a marketing order. It provides that whenever the Department has reason to believe that a marketing order (or amendments to a marketing order) will promote the policy of the CMA with respect to any commodity, the Department shall give notice and hold a hearing. (§§ 58771, 58782; see also §§ 58773-58781, 58783-58788.) The notice must include the date and place of the hearing, the commodity and area covered by the proposed marketing order, and a statement that the Department will receive, at the hearing, evidence about the subjects for which the Department is required to make findings as a precondition to the issuance of an order. (§ 58774.)

The hearing on a proposed marketing order must be public, and all testimony must be received under oath. (§ 58782; see also § 58786.) The CMA requires the Department to consider all relevant matter presented at the hearing and to preserve a complete record of the proceedings for judicial review. (§§ 58782, 58783, 58787; *Voss, supra*, 46 Cal.App.4th at p. 924.) Upon conclusion of the hearing, but prior to issuing a marketing order, the Department must make specific findings appropriate for the type of order proposed. (§§ 58811-58813; *Ross, supra*, 240 Cal.App.4th at p. 1258.)

To adopt a marketing order with provisions for advertising, sales promotion, or research, the Department must find that: (1) the proposed marketing order will "tend to effectuate" the declared purposes and policies of the CMA; (2) the proposed marketing order is reasonably calculated to attain the objectives sought in the order; and (3) the

6

powers under the CMA are being exercised only to the extent necessary to attain such objectives. (§ 58813, subds. (a)-(c).) These findings must be based on the facts, testimony, and evidence received at the hearing, "together with any other relevant facts which are available to [the Department] from official publications or institutions of recognized standing." (§ 58813.)

Even if the Department makes the required findings, a marketing order will not become effective unless it is approved by the prescribed percentage of persons affected by the order. (§§ 58991-58993.) The Department may elect whether such approval shall be determined by written assent or by referendum. (§§ 58786, 58787, 58991-58998.)[4]

For a referendum to be valid, at least 40 percent of eligible affected producers must vote. (§ 58993, subd. (c).) For the referendum to pass, it must be approved by either (1) at least 65 percent of the voters, representing not less than 51 percent of the total quantity of the commodity produced for market, or (2) at least 51 percent of the voters, representing not less than 65 percent of the total quantity of the commodity produced for market. (§ 58993, subd. (c).) The CMA permits "any nonprofit agricultural cooperative marketing association, which is authorized by its members so to assent," to bloc vote on behalf of that association's members. (§ 58999.)

Approved marketing orders are administered and enforced by the Department. (§ 58711.) But the CMA requires that marketing orders establish an advisory board to assist the Department in the administration of the order. (§§ 58841, 58842.) The advisory board's duties include recommending rules and regulations, receiving and reporting complaints of violations of the marketing order, and assisting in preparing budgets and collecting funds to cover expenses. (§§ 58846, 58923.)

---

[4] The CMA sets out the standards for approval by written assent for producers (§ 58993), processors (§ 58992) and handlers (§ 58991). (*Voss, supra*, 46 Cal.App.4th at p. 918, fn. 9.)

7

Members of an advisory board may be nominated by the affected producers and handlers, but are appointed by, and serve at the pleasure of, the Department. (§ 58841.) While the members of an advisory board generally must represent the agricultural industry covered by the marketing order, the Department may appoint one person to represent the public. (§§ 58842-58843.) For any marketing order affecting raisin producers, the Department also must appoint one advisory board member to represent "cooperative bargaining associations." (§ 58842.5; see also § 54401 [defining "cooperative bargaining association"].)

A marketing order has no fixed lifespan. (*Voss, supra*, 46 Cal.App.4th at p. 921.) It can be terminated at any time and must, at minimum, be reapproved every five years. (§§ 59081, 59082, 59086.)

BACKGROUND FACTS AND PROCEDURE

*The challenged Marketing Order*

For decades, until the early 1990's, there was a state marketing order for raisins administered by the California Raisin Advisory Board, best known for creating the "Dancing Raisins" promotional campaign. However, due to disagreements between the producers (growers) and independent packers, the prior marketing order was terminated in 1994.

At the time the prior marketing order was terminated, California's raisin industry was experiencing persistent oversupplies of raisins. Although the federal government had implemented programs to reduce the oversupply, the programs had the effect of reducing producer profits. Thus, many participants in the raisin industry, including the RBA and Sun-Maid Growers of California (Sun-Maid), a large cooperative marketing association, were supportive of a new state marketing order.

In March of 1998, the RBA and Sun-Maid, collectively representing a majority of the producers in the raisin industry, proposed a new Marketing Order designed to increase demand for raisins. The proposed Marketing Order declared that the "inability

8

to maintain or expand present markets, or to develop new or larger markets results in an unreasonable and unnecessary waste of the [state's] agricultural wealth," and that it is "therefore in the public interest for the producers of California raisins to establish a [marketing board] to conduct market development activities to improve the demand for all categories of raisin usage . . . ." To further this goal, the proposed Marketing Order would authorize a research and promotional program administered by the Department and funded by an assessment on raisin producers.[5]

To help the Department administer the program, the proposed Marketing Order established a Board consisting of 15 members, 13 of whom must be producers or persons authorized to represent the producers (the producer members), with one member representing the general public, and one member representing the largest cooperative bargaining association (here, the RBA). The Marketing Order specifies that nominations and appointments of the producer members must be made from three groups—cooperative marketing associations, cooperative bargaining associations, and other (i.e., independent) producers—based on each group's proportional share of raisin production.[6] The Marketing Order provides that the Board may take action by majority vote of the quorum, except on fiscal matters, which requires a vote of eight members. The Marketing Order states that all activities of the Board shall be equally available to all producers of California raisins, and that the Board shall plan its activities to benefit each variety of raisin in proportion to the assessments paid by the producers of that variety.

---

[5] The Board's research and promotional activities are funded by a uniform assessment on producers of approximately 2 percent of the field price on each ton of "free tonnage" raisins delivered to packers (i.e., raisins not subject to the reserve pool).

[6] In practice, this has resulted in Sun-Maid members holding three to four seats, the RBA members holding four to five seats, the RBA itself holding one seat, and independent producers holding five to six seats of the fourteen nonpublic member seats on the Board.

In accordance with the CMA, the Department held a public hearing on the proposed Marketing Order, receiving testimony from 16 witnesses. Following the hearing, and receipt of additional written comments, the Department adopted "economic findings" in support of the proposed Marketing Order.

In its findings, the Department listed the policies and purposes of the CMA, as described in sections 58652 and 58654, and then found that the Marketing Order would tend to effectuate those policies and purposes by funding research regarding the potential health benefits of raisins, educating the public about the versatility and healthful properties of raisins, and fostering efficient marketing and promotion of raisins, so as to increase the demand for raisins, better correlate raisin supply with demand, decrease economic waste, and increase the purchasing power of raisin producers. Based on its findings, the Department issued the proposed Marketing Order subject to the approval by referendum of the affected raisin producers.

Between June and July of 1998, the Department held the required referendum. For purposes of voting on the referendum, the Department took the position that Sun-Maid and the RBA could elect to bloc vote on behalf of their membership as "cooperative marketing associations" under section 58999. Both Sun-Maid and the RBA elected to bloc vote, although both also allowed their members to "opt out" and vote separately if they wished. Based on the voting results of the referendum, the Marketing Order was approved.

In 2001, the Department held the first "continuation" (reapproval) referendum on the Marketing Order. For the 2001 referendum, neither Sun-Maid nor the RBA elected to bloc vote. Nevertheless, producers overwhelmingly voted to continue the Marketing Order.

At the next continuation referendum, in 2006, the Marketing Order again was approved. For the 2006 referendum, both Sun-Maid and the RBA elected to bloc vote.

*The Board's advertising program*

Since its inception, the Board's advertising and promotion has been a generic program focusing on the virtues of California raisins generally, without reference to particular brands or sellers. The Board's first major campaign, entitled "Look Who's Cooking with California Raisins," focused on using celebrity chefs to promote new uses for raisins. Subsequent campaigns included the "Wise Choice" campaign, which was designed to show how raisins could be used by people looking for "healthy, nutritious foods on the go," and the "Solar Powered Goodness" campaign, which emphasized the benefits of eating natural, sun-dried fruit.

The Board also maintains a Web site and produces brochures. Prior to 2010, some of the Web pages and brochures referred to Thompson seedless raisins and mentioned the "tray-drying" method. In addition, the phrase "Thompson Seedless Grapes make the best California raisins" was used in a promotional blurb in a brochure and posted in a few places on the Board's approximately 1,260-page Web site. The materials containing these references constituted a small part of the Board's promotional materials. The Board has since updated the materials to remove the phrase that "Thompson Seedless Grapes make the best California raisins," to replace references to "Thompson Seedless" grapes with "Natural Seedless" grapes, and to include "dried-on-the-vine" methods of drying raisins.

*Trial and first appeal*

When the Lion complaint originally was filed in 2002, it challenged the Marketing Order only on free speech/free association grounds. That case was then stayed for several years pending the outcome of certain appellate cases.[7] By 2011, when the stay was lifted, the legal landscape for free speech claims had shifted. This was due, in part,

---

[7] During the pendency of the stay, the parties agreed to escrow the entire amount of Lion's assessments due under the Marketing Order.

to the United States Supreme Court's decision in *Johanns v. Livestock Marketing Assn.* (2005) 544 U.S. 550 [161 L.Ed.2d 896] (*Johanns*), holding that the government's own speech is not susceptible to a First Amendment-compelled subsidy challenge. (*Id*. at p. 559; see also *Gallo Cattle Co. v. Kawamura* (2008) 159 Cal.App.4th 948, 951-952 (*Gallo Cattle*) [following *Johanns*].) Thus, in 2011, Lion was granted leave to amend its complaint to include additional challenges to the Marketing Order.

As amended, the Lion complaint alleged five causes of action. The first two causes of action alleged the Marketing Order violates the free speech and free association clauses of the California Constitution. The third cause of action alleged a violation of liberty interests protected by the federal and state due process clause. The fourth cause of action alleged a violation of the Marketing Order based on the "varietal benefit" provisions in section 58749. The fifth cause of action alleged that allowing the RBA to bloc vote was unlawful and an invalid exercise of the police power.

The Department's complaint against Raisin Valley alleged that the defendants had improperly failed and refused to remit assessments due under the Marketing Order. The Department sought an injunction enjoining Raisin Valley from committing further violations of the Marketing Order and compelling Raisin Valley to pay overdue assessments (plus costs and penalties).

Raisin Valley's amended cross-complaint alleged nine causes of action against the Department. The first cause of action alleged the Marketing Order violates the police power because the Board's membership was inconsistent with section 58842.5. The second cause of action alleged the Marketing Order violates the police power because its reapproval provisions were inconsistent with sections 58993 and 59086. The third cause of action alleged the Marketing Order is invalid because the Department allowed the RBA to bloc vote, in violation of section 58999 (and/or due process). The fourth, fifth, sixth, and seventh causes of action alleged the CMA's bloc-voting provisions violate the state and federal equal protection clauses, federal free association rights, and federal due

12

process. The eighth and ninth causes of action alleged that the Marketing Order violates the state constitutional rights of free speech and free association, and state and federal due process, by compelling appellants to subsidize the speech of, and associate with, the Board.

In 2013, following a 19-day bench trial, and posttrial briefing, the court granted judgment for the appellants. Although numerous issues were presented by the parties, the trial court's judgment rested on a single issue—a finding that the record lacked sufficient evidence to support the finding that the Marketing Order would " 'tend to effectuate the declared purposes and policies' " of the CMA. (*Ross, supra*, 240 Cal.App.4th at p. 1256.)

Relying on the legislative findings of the CMA, the bulk of which were adopted during the Great Depression, the trial court concluded that the Department cannot adopt a marketing order under the CMA unless the order is necessary to address adverse economic conditions so severe as to threaten the continued viability of the industry. (*Ross, supra*, 240 Cal.App.4th at pp. 1264-1265.) The trial court found no evidence in the record before it that the raisin industry was suffering from a severe economic crisis. (*Id*. at p. 1259.) Thus, the trial court found the Department's Marketing Order was invalid and that the Department improperly exercised its police power in adopting the order. (*Id*. at p. 1256.)

In *Ross, supra*, 240 Cal.App.4th at pages 1256-1257, we reversed the trial court's judgment. We held the trial court erred in construing section 58813, subdivision (b) to be met only if a marketing order was necessary to address a severe economic crisis. (*Ross*, at p. 1267.) We noted that subsequent to its adoption, the CMA was amended to divide marketing orders into "two camps: those that restrict the supply of a commodity (i.e., restrict quantity), and those that do not." (*Ross*, at p. 1265.) As a result of that amendment, only marketing orders that restrict the supply of a commodity "require economic findings concerning the correlation of supply and demand and a particular level

13

of producer purchasing power, as well as the consideration of particular economic factors . . . ." (*Id*. at p. 1258; §§ 58811 & 58812.)

We held that marketing orders that do not restrict supply—including orders for advertising, sales promotion, or research—do not require economic findings concerning the correlation of supply and demand and a particular level of purchasing power, or the consideration of particular economic factors. (*Ross, supra*, 240 Cal.App.4th at pp. 1258, 1265-1266.) Instead, such orders are valid as long as they are supported by "generalized findings" that the order will " 'tend to effectuate' " the purposes and policies of the CMA.[8] (*Ross*, at pp. 1265-1266; § 58813.) Thus, we reversed and remanded for further proceedings consistent with our opinion. (*Ross*, at p. 1267.)

*The court's decision after remand*

On remand, the trial court reconsidered whether there was sufficient evidence to support the Department's finding that the Marketing Order would tend to effectuate the purposes and policies of the CMA. Applying a broader interpretation of section 58813, the court concluded that there was substantial evidence to support that finding.

The trial court then addressed the "remaining challenges" to the Marketing Order, which it identified as (1) whether the Department violated section 58999 by allowing the RBA to bloc vote; (2) whether section 58999 is unconstitutional; (3) whether the Marketing Order violated appellants' free speech or free association rights; (4) whether the Board's advertising program violated the Marketing Order by failing to equally promote and/or disparaging dried-on-the-vine raisins; and (5) whether the Marketing Order is invalid because the Department failed to consider reasonable alternatives to the Marketing Order before adopting it. After further briefing, the court issued its final

---

[8] We also noted that a marketing order need not effectuate *all* the purposes and policies of the CMA, "something that would not be practicable." (*Ross, supra*, 240 Cal.App.4th at p. 1264, fn. 7.)

14

statement of decision, finding for the Department on all remaining issues. Both Lion and Raisin Valley timely appealed the court's judgment in each of their respective cases.

DISCUSSION

I

*The Raisin Valley Appeal*

As a threshold matter, we must consider whether we have jurisdiction over the Raisin Valley appeal in view of the fact that the judgment in the Raisin Valley case fails to dispose of the Department's claims against Raisin Valley.

"An appealable judgment is a jurisdictional prerequisite to an appeal. [Citation.]" (*Martis Camp Community Assn. v. County of Placer* (2020) 53 Cal.App.5th 569, 587.) "Under the 'one final judgment' rule, an order or judgment that fails to dispose of all claims between the litigants is not appealable. [Citations.]" (*Ibid.*)

At our request, the parties briefed the question whether the judgments at issue here are appealable. In a joint supplemental brief, the parties all agree that the Raisin Valley judgment is not final and the appeal should be dismissed. They contend, however, that the Lion appeal, which was consolidated only for purposes of trial, involves a final judgment and should not be dismissed. We agree. We therefore dismiss the appeal in the Raisin Valley case and limit our discussion to the claims in the Lion case.

II

*Failure to Exhaust Administrative Remedies*

Before turning to the merits of the Lion appellants' claims, we first address the Department's argument that several claims are barred because appellants failed to exhaust available administrative remedies under section 59240 of the CMA and the Marketing Order. In particular, the Department argues that the Lion appellants (hereafter referred to as appellants) failed to exhaust their claims that (1) the Board's marketing activities disparaged and failed to promote appellants' dried-on-the-vine raisins, and (2) the Department unlawfully permitted bloc voting.

15

The rule of exhaustion is well established in California. "In brief, the rule is that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292; accord, *City of Sacramento v. State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 969; see also *Dunham v. City of Westminster* (1962) 202 Cal.App.2d 245, 249-250 [rule of exhaustion applies to declaratory relief claims].) This is not a matter of judicial discretion, but a jurisdictional prerequisite to resort to the courts. (*City of Sacramento, supra*, at p. 969; *California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1151.)

The primary purpose of the rule is to lighten the burden of overworked courts and provide administrative agencies with the opportunity to decide matters within their area of expertise prior to judicial review. (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 616; *Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 501.) Even where the administrative remedy may not provide complete relief, the doctrine is still "viewed with favor 'because it facilitates the development of a complete record that draws on administrative expertise and promotes judicial efficiency.' " (*Sierra Club, supra*, at p. 501.)

Appellants bear the burden of demonstrating that the issues raised in the judicial proceeding were first raised at the administrative level. (*Monterey Coastkeeper v. State Water Resources Control Bd.* (2018) 28 Cal.App.5th 342, 359; *Westinghouse Elec. Corp. v. County of Los Angeles* (1974) 42 Cal.App.3d 32, 37.) We exercise our independent judgment on the legal question of whether the doctrine applies in a given case. (*Monterey Coastkeeper, supra*, at p. 359.)

Here, we conclude that appellants have failed to exhaust their available administrative remedies as to their product disparagement/failure to promote claim.

Under section 59240 of the CMA, any interested party may file an administrative complaint alleging "any violation" of the CMA or a marketing order, rule, or regulation

16

issued by the Department. When such a complaint is filed, the Secretary either must refer the matter to the Attorney General or a district attorney for the institution of legal proceedings, or hold an evidentiary hearing to consider the claim. (§§ 59240, 59242, 59244, 59245.)

The Marketing Order also contains its own appeal procedure under which "[a]ny producer . . . who believes that any act or determination by or on behalf of the Board, its committees or staff has been or will be detrimental or adverse to the producer's interests . . . may petition the Department to . . . correct the detrimental or adverse impact." If the Department finds that "the Board has acted in a fashion inconsistent with [the CMA], or this Marketing Order or that the Board has implemented the Marketing Order in an unreasonably discriminatory, unfair or inequitable manner," the Department shall declare the challenged act or determination to be without force and effect, and may order the Board to take steps to correct any harm suffered by the petitioner. (See *Brock v. Superior Court* (1952) 109 Cal.App.2d 594, 610 [finding failure to exhaust based on appeal procedure in marketing order]; *People for Ethical Treatment of Animals, Inc. v. California Milk Producers Advisory Bd.* (2005) 125 Cal.App.4th 871, 882, fn. 10 [noting requirement to exhaust under section 59240].)

Appellants failed to meet their burden of proving that they exhausted either of these administrative remedies with respect to their disparagement claim. Appellants have not cited, and we have not found, any evidence that they filed an administrative petition or complaint with the Department objecting to the Board's marketing activities or the bloc-voting provisions.[9] Accordingly, appellants failed to exhaust their administrative remedies.

_____

[9] We acknowledge that Bruce Lion and others submitted a letter to the Department in May 1998 seeking assurances that there would be proportional funding of dehydrated raisins, but the letter was directed to the terms of the *proposed* Marketing Order, and was

17

Appellants argue they should be excused from pursuing their administrative remedies because exhaustion would have been futile. We are unpersuaded. Futility is a narrow exception which applies only when the party invoking the exception "can positively state that the administrative agency has declared what its ruling will be in a particular case." (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1313.) That was not the case here. If the Board was not fulfilling the Marketing Order's "promise" for proportionate promotion of dried-on-the-vine raisins, as appellants argue, it was incumbent on them to bring that charge to the Department to take steps to correct the purported violation.[10] Because they failed to do so, we conclude appellants failed to exhaust their administrative remedies with respect to the "varietal benefit" and "non-disparagement" claims, depriving the Department of the opportunity to develop a factual record and apply its expertise to the issues raised.[11] Thus, the claim is not properly before this court and should be dismissed.[12]

We reach a different conclusion regarding the bloc-voting claims. We conclude appellants' failure to exhaust those claims must be excused because the available administrative remedies were inadequate to address them. (*California Water Impact*

_____

not complaining about the Board's implementation of the approved Marketing Order. Thus, the letter is not relevant to the claim in appellants' complaint alleging violations *of* the Marketing Order.

[10] Indeed, if the Board's promotional activities are violating the terms of the Marketing Order, the appropriate remedy seemingly would be to change the promotional activities rather than suspend or terminate the Marketing Order.

[11] It matters not that the trial court did not rule on this issue, because exhaustion presents a pure question of law. (*Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123, 1136.)

[12] As an alternative ground, we also conclude that appellants forfeited any challenge to the sufficiency of the evidence regarding their promotion/disparagement claim by failing to set forth in their brief all of the material evidence relating to that issue, including much of the evidence on which the trial court relied in its statement of decision.

*Network v. Newhall County Water Dist.* (2008) 161 Cal.App.4th 1464, 1490 [exhaustion is not required when the available administrative remedy is inadequate].) The Marketing Order's appeal procedure was inadequate because, by its terms, the appeal procedure applies only to acts or determinations "by or on behalf of the Board," whereas the bloc-voting claims were concerned with actions taken by the Department, not the Board.

For similar reasons, we conclude the administrative hearing procedure in section 59240 was inadequate. Under that procedure, when an administrative hearing is held, the hearing must be conducted by, and findings issued by, the Department's Secretary. (§§ 59244, 59245.) But such a procedure is inappropriate where, as here, the Department itself is claimed to have engaged in wrongdoing. Under such circumstances, the Department essentially would be asked to judge the correctness of its own decisions, which would be contrary to due process. (See, e.g., *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 223; *Brown v. City of Los Angeles* (2002) 102 Cal.App.4th 155, 177.) Accordingly, we construe section 59240 more narrowly, giving the Department authority to enforce violations against private parties, but not allowing the Department's Secretary to resolve complaints against the Department itself.[13] Applying this construction to this case, we agree with appellants that they were not required to exhaust their claims against the Department related to the bloc-voting provisions of the CMA.

---

[13] We find further support for this interpretation in the language of former section 1300.19, the predecessor to section 59240, which prescribed criminal and civil penalties when a " 'person' " violated a marketing order issued " 'by the director.' " (*People v. Harter Packing Co.* (1958) 160 Cal.App.2d 464, 467.)

III

*Violation of Section 58999*

Under section 58999, only a "nonprofit agricultural cooperative marketing association" is entitled to bloc vote on behalf of its members. (§ 58999.) That term, however, is not defined. Before the Department promulgated the Marketing Order, Department staff considered whether the RBA was a cooperative marketing association for purposes of section 58999, and determined that it was.[14] After hearing the evidence at trial, the court below reached the same conclusion. On appeal, appellants argue the trial court erred because the RBA was a bargaining association, not a marketing association, and therefore the RBA should not have been permitted to bloc vote in the referendums. The Department, in turn, argues the RBA was *both* a bargaining association *and* a marketing association, and therefore entitled to bloc vote.

To resolve this claim, we must answer the following two questions: (1) whether a cooperative bargaining association may qualify as a cooperative marketing association within the meaning of section 58999 and, if so, (2) whether the RBA qualified as a marketing association because it was involved in marketing.

" 'In construing a statute, our fundamental task is to ascertain the Legislature's intent so as to effectuate the purpose of the statute. [Citation.] We begin with the language of the statute, giving the words their usual and ordinary meaning. [Citation.]

---

[14]    Prior to the initial referendum on the proposed Marketing Order, the RBA enlisted Dr. Leon Garoyan, Ph.D., the Director of the University of California Center for Cooperatives, to investigate the RBA's authority to bloc vote. Dr. Garoyan concluded that the RBA was authorized to bloc vote, and prepared a memorandum explaining the bases for his conclusion, which relied on the RBA's articles of incorporation, bylaws, membership agreement, and master contract with processors/packers. The RBA then presented Dr. Garoyan's memorandum to the Department. Thus, there was evidence before the Department to support its determination that the RBA was authorized to bloc vote.

20

The language must be construed "in the context of the statute as a whole and the overall statutory scheme, and we give 'significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' " [Citation.] In other words, " 'we do not construe statutes in isolation, but rather read every statute "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." [Citation.]' " [Citation.] If the statutory terms are ambiguous, we may examine extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we choose the construction that comports most closely with the Legislature's apparent intent, endeavoring to promote rather than defeat the statute's general purpose, and avoiding a construction that would lead to absurd consequences. [Citation.]' [Citation.]" (*Estate of Kelly* (2009) 172 Cal.App.4th 1367, 1373.)

Our focus here is on section 58999's use of the term "nonprofit agricultural cooperative marketing association," which we logically may conclude is a nonprofit agricultural cooperative association involved in "marketing." (§§ 54002, 54033, 54036, 54037.) The relevant question, then, is how to define "marketing."

As noted, neither the CMA nor California's cooperative association laws directly define "marketing" or a "marketing association," but the CMA's general definitions do provide helpful guidance. Among other terms, the CMA broadly defines "producer marketing" to mean "any or all operations which are performed by any producer in preparing [a commodity] for market. It includes selling, delivering, or disposing of for commercial purposes, to any handler any commodity which the producer has produced." (§ 58621; accord, § 58614; see also § 66537.) Likewise, under section 58620, a "producer" is defined to mean any person engaged in the business of producing a commodity "for market" (§ 58620), and is distinguished from "handlers" or "processors," which may engage in their own marketing. (§§ 58611, 58619, 58712, 58741, 58881; see also §§ 54039, 54261 [referring to agreements between cooperative associations and their

21

members as a "marketing contracts"].)  These definitions show, contrary to what appellants argue, that "marketing" is not limited to sales of "processed" raisins.  Rather, producers may engage in "marketing" merely by selling or delivering the commodity to a handler for commercial purposes.

We find further support for this conclusion in the language of section 58993, under which no marketing order which directly affects producers is effective until approved by the specified percentage of producers affected by the order.  The statute provides that for a referendum to pass, it must be approved by producers which "marketed" not less than 51 percent (or, in some cases, not less than 65 percent) of the total quantity of the commodity in the relevant season.  (§ 58993, subd. (c).)  Again, we find the CMA's use of the term "marketing" inconsistent with appellants' argument that a marketing association must process raisins or sell processed raisins.

Our construction also is consistent with the ordinary definition of the word "marketing."  In its broadest sense, the dictionary defines marketing as the "aggregate of functions involved in moving goods from producer to consumer."  (Merriam-Webster's Online Dictionary < https://www.merriam-webster.com/dictionary/marketing> [as of May 21, 2021], archived at <https://perma.cc/SZ9D-PQ6Q>; see *Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121-1122 ["When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word"].)

We are not aware of any cases construing the meaning of the term "marketing" for purposes of the CMA, but courts have construed that term for purposes of the Capper-Volstead Act (7 U.S.C. §§ 291, 292), which provides limited antitrust immunity for cooperatives that market their members' products.  In *Treasure Valley Potato Bargaining Assn. v. Ore-Ida Foods, Inc.* (9th Cir. 1974) 497 F.2d 203, the Ninth Circuit held that two bargaining associations, the principal function of which was to bargain collectively for prices, terms, and conditions of preseason potato contracts, were entitled to antitrust

22

immunity even though they did not process, handle, buy, or sell any potatoes. The court reasoned that the associations were entitled to immunity because they performed marketing functions "in bargaining for the sales to be made by their individual members," which "necessarily requires supplying market information and performing other acts that are part of the aggregate of functions involved in the transferring of title to the potatoes." (*Id*. at p. 215; accord, *Northern California Supermarkets, Inc. v. Central California Lettuce Producers Cooperative* (N.D.Cal. 1976) 413 F.Supp. 984, 991-992.)

This brings us back to the language of section 58999, which provides: "In finding whether [a] marketing order . . . is . . . approved or favored by producers . . . , the [Secretary] shall consider the approval of any nonprofit agricultural cooperative marketing association, which is authorized by its members so to assent, as being the assent, approval, or favor of the producers that are members of, or stockholders in, that nonprofit agricultural cooperative marketing association." (§ 58999.) Because the purpose of the statute is limited to the approval of marketing orders by affected producers, which themselves must have "marketed" the commodity, it is logical to construe the term "marketing" to include "producer marketing" as defined in section 58621. It follows that for purposes of section 58999, a cooperative marketing association includes an association involved in selling or delivering commodities to handlers for commercial purposes. On its face, this may include a cooperative bargaining association, which is an association organized and functioning "for the purpose of group bargaining between its producer members and the first handler or processor, with respect to the sale of any agricultural commodity . . . ."[15] (§ 54401.)

---

[15] In reaching this conclusion, we have not considered appellants' arguments based on the "literature on bargaining and marketing cooperatives," which were raised for the first time in their reply brief.

23

Appellants argue that federal law and the state Marketing Order distinguish between marketing and bargaining associations for purposes of selecting members for the advisory board/committee. Appellants are correct (see, e.g., §§ 58841-58842.5), but they do not explain why this should control the interpretation of a statute which uses different language and has nothing to do with allocating seats on the advisory board.[16]

Appellants also suggest that an organization cannot be both a bargaining association and a marketing association. But appellants have not cited any authority to support their claim that a bargaining association cannot also be a marketing association for purposes of the bloc-voting provisions in section 58999. Accordingly, we conclude, as did the trial court, that a cooperative bargaining association may qualify as a cooperative marketing association within the meaning of section 58999 if it is involved in marketing.

Having so concluded, we next consider whether the trial court correctly concluded that the RBA was a marketing association because it was involved in marketing. As appellants acknowledge, the facts relating to the RBA's organization and operations are not in dispute. The interpretation and application of a statute to an undisputed set of facts is a question of law, subject to de novo review. (*Stanford Vina Ranch Irrigation Co. v. State of California* (2020) 50 Cal.App.5th 976, 998.)

The evidence in the record shows that the RBA was formed as a nonprofit agricultural cooperative association authorized to render "selling" and "marketing" services to its members. The RBA's bylaws specifically authorize it to "assent in writing or otherwise, on behalf of the members of [the RBA] and all producers of products

---

[16] Under federal law and the raisin Marketing Order, only members of a cooperative marketing association engaged in the processing/handling of raisins are eligible for a representative seat on the advisory board/committee. (7 C.F.R. §§ 989.17, 989.26, subd. (a); cf. 7 C.F.R. § 989.12a.)

24

marketed or to be marketed by [the RBA], to any marketing order or amendment thereto . . . ."  The RBA membership agreement, which sets forth the terms of membership, provides that the purpose of the association is to allow growers throughout the state to "more efficiently and economically market" their products by joining together in a cooperative association.  To further this purpose, the membership agreement provides that the producer members shall sell and deliver their product to the RBA, which shall take delivery of the product and then sell it to processors or packers at prices determined by the RBA.[17]

Although deliveries to processors are made in the name of the producer, and most of the purchase price is paid directly to the producer, the actual sale is between the RBA and the processor/packer.  Title and the right to possession of the product passes from the producer to the RBA, and then from the RBA to the processor/packer.  Members can express preferences respecting the processor/packer to which they wish to deliver their product, but the RBA has the ultimate authority to decide where the product is delivered.  And the RBA has the "sole discretion" to determine the price at which the product is sold.

Based on these facts, we conclude the trial court correctly determined that the RBA was a marketing association.  Thus, we uphold the trial court's conclusion that the RBA was authorized to bloc vote under section 58999.

---

[17]     The RBA permits individual producers to market their product directly, but any such individual agreements must be consistent with the terms and conditions of the membership agreement and the master contract between the RBA and the signatory processors/packers.

IV

*Constitutional Challenge to Section 58999*

In addition to arguing that the Department violated section 58999 by permitting the RBA to bloc vote as a nonprofit agricultural cooperative marketing association, appellants challenge the constitutionality of the bloc-voting statute itself. Appellants contend section 58999 violates the equal protection clause because it gives cooperative marketing associations, such as Sun-Maid, disproportional voting power.[18] We are unpersuaded.

The critical first step when determining whether state legislation violates the equal protection clause is to determine the appropriate level of judicial scrutiny to be applied.[19] (*Southern Cal. Rapid Transit Dist. v. Bolen* (1992) 1 Cal.4th 654, 664 (*Bolen*).) " 'The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. [Citations.]' " (*Sacramentans for Fair Planning v. City of Sacramento* (2019) 37 Cal.App.5th 698, 710, italics omitted.)

In the typical equal protection case involving social welfare or economic legislation, the classification need only bear a rational relationship to a conceivable legitimate state purpose. (*Hernandez v. City of Hanford* (2007) 41 Cal.4th 279, 298-299; *Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 913 (*Board*

---

[18] Although the Lion complaint alleged an improper exercise of the police power, and did not use the term "equal protection," we liberally construe the complaint to include a claim that the statute is an invalid exercise of the police power because it violates the right to equal protection under the law. (*Aden v. Younger* (1976) 57 Cal.App.3d 662, 673 [equal protection clause is a limitation on the police power].)

[19] The equal protection clauses in the federal and state Constitutions (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a)) guarantee substantially similar rights, and courts analyze them in a similar fashion. (*Griffiths v. Superior Court* (2002) 96 Cal.App.4th 757, 775.)

*of Supervisors*).)  On the other hand, statutes which create suspect classifications or impinge on fundamental rights are subjected to strict scrutiny.  (*Hernandez, supra*, 41 Cal.4th at p. 299.)  "Under this very severe standard, a discriminatory law will not be given effect unless its classification bears a close relation to the promoting of a compelling state interest, the classification is necessary to achieve the government's goal, and the classification is narrowly drawn to achieve the goal by the least restrictive means possible.  [Citations.]"  (*Board of Supervisors, supra*, 3 Cal.4th at p. 913.)

The right to vote is a fundamental right.  (*Board of Supervisors, supra*, 3 Cal.4th at p. 913.)  But not every law that "touches on the right to vote" requires strict scrutiny.  (*Board of Supervisors*, at p. 914; accord, *People v. Boulerice* (1992) 5 Cal.App.4th 463, 473; see also *California Gillnetters Assn. v. Department of Fish & Game* (1995) 39 Cal.App.4th 1145, 1161 [even statutes which severely restrict the pursuit of an occupation are tested under the rational basis test].)  The question presented here is whether section 58999 impinges on the right to vote in a manner that requires the application of strict scrutiny.

Appellants contend section 58999 should be subjected to strict scrutiny because it offends the "one person, one vote" principle articulated in *Reynolds v. Sims* (1964) 377 U.S. 533 [12 L.Ed.2d 506], under which each person's vote must be approximately equal in weight to that of any other person in a representative election.  (*Id.* at pp. 568, 579; accord, *Gray v. Sanders* (1963) 372 U.S. 368, 379 [9 L.Ed.2d 821, 829-830] ["Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote"].)  Appellants contend section 58999 is inconsistent with the "one person, one vote" principle because it essentially allows cooperative marketing associations to stuff the ballot box, thereby "diluting" the votes of independent producers and "disenfranchising" the dissenting members of the cooperative associations.

27

However, as appellants acknowledge, there is a recognized exception to the "one person, one vote" requirement when the election relates to a governmental body performing a specialized governmental function that has a disproportionate effect on a definable segment of the community. (*Bolen, supra*, 1 Cal.4th at p. 665.) When these conditions are met, "the strict demands of *Reynolds* [*v. Sims*]*, supra*, 377 U.S. 533, do not apply and voting power 'may be apportioned in ways which give greater influence to the citizens most affected by the organization's functions' [citation] without violating the guarantee of equal protection . . . ." (*Bolen, supra*, at p. 665.)

The United States Supreme Court applied this exception in two leading cases: *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.* (1973) 410 U.S. 719 [35 L.Ed.2d 659] (*Salyer*) and *Ball v. James* (1981) 451 U.S. 355 [68 L.Ed.2d 150] (*Ball*). *Salyer* involved a challenge to the election of the board of directors of a small California water storage district. (*Salyer, supra*, 410 U.S. at pp. 721, 724-725.) The statutory scheme at issue in *Salyer* limited voting to owners of land within the district, and apportioned voting power according to the assessed value of each owner's land. (*Id*. at pp. 724-725.) The voting scheme was challenged on equal protection grounds by, among others, residents of the district who were not allowed to vote because they did not own land within the district. (*Id*. at p. 724.) In upholding the property-based voting scheme, the court concluded that the "one person, one vote" requirement did not apply because the district's purposes were specialized and narrow and its activities disproportionately affected the voters responsible for paying its costs. (*Id*. at pp. 727-730.)

*Ball, supra*, 451 U.S. 355 similarly involved a challenge to the procedures used to elect a water storage district board. (*Id*. at p. 357.) Similar to *Salyer*, the statute limited voting to those owning land within the district, with voting power weighted in proportion to acreage owned. (*Ball*, at p. 357.) Although the district at issue in *Ball* was significantly larger and performed more functions than the district in *Salyer*, including selling power to almost half the state's population, the court again concluded that the

28

district fell within the exception to the one person, one vote principle. (*Ball*, at pp. 365-366, 371.) The court reasoned that, despite its more diverse activities, the district's functions were still limited, and it did not exercise the sort of general government powers that triggers the "one person, one vote" requirement, such as imposing taxes, maintaining streets, operating schools, or providing health or welfare services. (*Id*. at p. 366.) Further, coordinate with its specialized purpose and functions, the district's activities fell disproportionately on the specific class of persons who were allowed to vote in the district elections. (*Id*. at pp. 370-371.)

Our Supreme Court applied the same two-pronged test in *Bolen, supra*, 1 Cal.4th 654. *Bolen* involved a validation proceeding filed by a transit district to validate special benefit assessment districts created to help defray the costs of a mass transit system through assessments on owners of commercial property. (*Id*. at pp. 659-660, 662-663, 673.) Although the transit district could establish the assessment districts without voter approval, its actions were subject to referendum if requested by the owners of at least 25 percent of the assessed value of real property within the district. (*Id*. at p. 660.) By statute, voting at such a referendum was limited to the owners of the real property who were subject to the assessments, and the voting power was apportioned based on the assessed value of the property. (*Ibid*.) Interveners in the validation proceeding challenged the validity of the assessment districts, contending the statute's property-based voting scheme violated the equal protection clause. (*Id*. at p. 663.)

In lockstep with the reasoning in *Salyer* and *Ball*, the court in *Bolen* concluded that the challenged voting scheme fell within an exception to the "one person, one vote" requirement because (1) the benefit districts were special-purpose government units lacking " 'general governmental powers,' " and (2) the class of eligible voters were

disproportionately affected by the election issue in that they were responsible for paying the assessments.[20] (*Bolen, supra*, 1 Cal.4th at pp. 665-666, 669-675.)

Applying these authorities, we agree with the trial court that the CMA's voting scheme does not require application of strict scrutiny. Voting in referendums on marketing orders does not involve the election of officials who will exercise general governmental powers, like voting in an election for national, state, or local representatives. (*Cecelia Parking Corp. v. United States Dept. of Agriculture/Agricultural Mktg. Serv.* (9th Cir. 1993) 10 F.3d 616, 624 (*Cecelia Packing*).) Rather, it involves the establishment of an advisory board, which has limited authority and performs specialized administrative functions generally related to the marketing, processing, distributing, or handling of agricultural commodities. (§§ 58712, 58841, 58846, 58881.) And the functions of the Board at issue in this case are even more limited, relating only to the research and promotion of raisins. (§§ 58889, 58892.) Under the circumstances, we conclude that the raisin Board is the sort of "special-purpose" governmental unit that is not subject to the strict requirements of *Reynolds v. Sims, supra*, 377 U.S. 533.[21]

We draw additional support for our conclusion from the Ninth Circuit's decision in *Cecelia Packing*, which rejected an equal protection challenge to the cooperative bloc-voting provisions under the federal AMAA. (*Cecelia Packing, supra*, 10 F.3d at pp. 617-618.) The court concluded that because the federal marketing order involves " 'relatively

---

[20] As to the latter finding, the court noted that the "issue-specific nature of referenda in general and of the assessment district elections in particular reduces somewhat the prominence equal protection values would assume if representational interests were at stake in the challenged election." (*Bolen, supra*, 1 Cal.4th at p. 671.)

[21] As *Bolen* makes clear, the fact that a marketing order authorizes assessments does not demand a different result. (*Bolen, supra*, 1 Cal.4th at pp. 660-661, 669-670; accord, *Ball, supra*, 451 U.S. at p. 366, fn. 11.)

limited authority,' " and is "not 'what might be thought as "normal governmental" authority,' " the legislation should be reviewed under the rational relationship test. (*Id.* at pp. 624-625.) We reach the same conclusion here.

Turning to the second prong of the *Bolen* test, which looks to the impact of the election outcome on voters and nonvoters, we find that there are genuine differences in the interests of those enfranchised and those disenfranchised under the legislation.[22] The persons "primarily affected" by the Marketing Order and its mandatory assessments— raisin producers—are enfranchised by the voting scheme. Those excluded from voting by the statutory scheme, such as raisin handlers and other commodity producers, are substantially less affected.[23]

Appellants complain that the bloc-voting provisions of section 58999 triggers strict scrutiny because it gives cooperative marketing associations disproportional voting power. However, when the strict demands of the "one person, one vote" principle do not

---

[22]     As the Department notes, appellants failed to discuss the second prong of the *Bolen* test in their opening brief. However, because the Department fully addressed the issue in a supplemental brief, we will not treat this issue as forfeited. In contrast, we conclude that appellants forfeited their arguments that (1) the statutory bloc-voting provision violates appellants' free association rights, and (2) requiring members to opt out of bloc voting is unconstitutional. (See *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764-765 and *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.)

[23]     We reject appellants' suggestion that the bloc-voting provisions "disenfranchise" members of cooperative marketing associations. Appellants are conflating the impact of a member's decision to join a cooperative marketing association with the impact of the statutory voting scheme. The second prong of the *Bolen* test focuses solely on the "contested statutory voting classification," and the extent to which there is a " 'genuine difference in the relevant interests' of those enfranchised and those excluded" by that statutory classification. (*Bolen, supra*, 1 Cal.4th at pp. 666, 670.) The class of eligible voters under the statutory voting scheme are the producers directly affected by the proposed marketing order. (§ 58993.) Bloc voting has not deprived cooperative members of their right to vote; they simply have authorized the cooperative to vote on their behalf.

apply, the apportionment of voting power among the enfranchised is subject to rational basis review.  (*Bolen, supra*, 1 Cal.4th at p. 677; *Salyer, supra*, 410 U.S. at pp. 733-734; *Ball, supra*, 451 U.S. at p. 371.)  Voting power may be apportioned in ways that give greater influence to some voters as long as the apportionment of power is not " 'wholly irrelevant' " to the objectives of the statute.  (*Bolen, supra*, at p. 678.)

Under the rational relationship test, we conclude that section 58999's bloc-voting provisions are rationally related to the legitimate governmental purposes of encouraging producers to join cooperative marketing associations, promoting orderly and efficient marketing of commodities, and preventing or reducing economic waste.  (§§ 58652, 58654; see also Corp. Code, §§ 14550, 14551.)  As the Ninth Circuit summarized in *Cecelia Packing, supra*, 10 F.3d 616:  By allowing the cooperative marketing associations to bloc vote, the government furthers its goal of encouraging producers to " 'join together . . . to increase their collective economic strength and advantage,' " thereby contributing to more stable and efficient markets.  (*Id*. at p. 625, fn. 8.)

For these reasons, we reject appellants' constitutional challenge to the bloc-voting provisions of section 58999.

V

*Post Hoc Rationalization*

Appellants also contend the trial court erred in allowing the Department to abandon its original rationale for the Marketing Order.  Appellants contend that the Department found that restoring and maintaining "producer purchaser power" was the "cornerstone" justification for the Marketing Order.  Because the trial court previously found "no evidence" that producer purchasing power was inadequate, appellants contend

32

the trial court was required to remand this matter to the Department for new findings.[24]
We disagree.

As we explained in *Ross*, the trial court erroneously interpreted section 58813, subdivision (b) to mean that the Department cannot adopt a marketing order for industry advertising or research unless the order is necessary to address adverse economic conditions so severe as to threaten the continued viability of the industry. (*Ross, supra*, 240 Cal.App.4th at p. 1264.) As a consequence, the trial court erroneously concluded the Department must show both that the purchasing power of raisin producers was so "low" as to threaten the economic viability of the industry, and that the Marketing Order was necessary to "restore" their purchasing power. Applying this narrow standard, the trial court found insufficient evidence of the existence of a crisis and of the necessity for the Marketing Order to meet that crisis.

In *Ross*, we rejected the trial court's interpretation as too narrow. (*Ross, supra*, 240 Cal.App.4th at pp. 1264-1265.) We held in *Ross* that if the marketing order does not restrict commodity supply, the Department is not required to find the order is " 'necessary' " to effect a reasonable correlation of supply and demand, or to find that the order would "reestablish or maintain a defined level of producer purchasing power." (*Id.* at p. 1265.) Nor is the Department required to find that a proposed marketing order will effectuate every purpose and policy of the CMA. (*Ross*, at p. 1264, fn. 7.) Instead, the Department merely has to make "generalized findings" that the proposed marketing order will " 'tend to effectuate the declared purposes and policies' " of the CMA. (*Ross*, at pp.

---

[24]     To the extent appellants argue the trial court failed to comply with our directions in *Ross, supra*, 240 Cal.App.4th 1254, or that there is insufficient "economic evidence" in the record to support the Marketing Order under any standard, we deem the arguments insufficiently developed to merit review.

1265-1266.) *Ross* disposes of appellants' argument that the Marketing Order is invalid because there is insufficient evidence that the producers' purchasing power was too low.

We likewise reject appellants' argument that the Department improperly "abandoned" its original rationale for the Marketing Order. Although the Department described producer purchasing power as a "cornerstone" of the Order, the "main objective" of the Order always was "to improve the demand for [raisins]." The Department found that the Marketing Order, by increasing demand for raisins, would increase returns for raisin producers, and thereby improve producer purchasing power. For this reason and others, the Department found that the Marketing Order would "tend to effectuate the declared purposes and policies of the [CMA]," which is the same finding the Department sought to defend on remand. We find no merit to appellants' contention that the Department abandoned its original justification for the Order and instead sought to uphold it based on the post hoc rationalizations of counsel.

VI

*Alternatives to Marketing Order*

The trial court rejected appellants' contention that the Marketing Order was invalid because the Department failed to consider reasonable alternatives before adopting it. On appeal, appellants argue the trial court's "conclusion is a clear misstatement of both statutory text and case law." Appellants contend that the plain language of section 58813 and governing case law required the Department to consider any reasonable alternatives to the Marketing Order and to state the basis on which they were rejected. Appellants contend that the Department failed to comply with this requirement even though several reasonable alternatives were proposed.

Appellants' claim lacks merit. Section 58813 does not require the Department to consider alternatives, or even mention alternatives. It provides, in relevant part: "If the marketing order or amendments to it contain provisions only for . . . advertising or sales promotion, or for research, the director may issue such marketing order or amendments to

34

it if [he or she finds]: [¶] (a) That such marketing order or amendments to it are reasonably calculated to attain the objectives which are sought in such marketing order[;] [¶] (b) That such marketing order or amendments to it are in conformity with the provisions of this chapter and within the applicable limitations and restrictions which are set forth in this chapter and will tend to effectuate the declared purposes and policies of this chapter[;] [and] [¶] (c) That the interests of consumers of such commodity are protected in that the powers of this chapter are being exercised only to the extent which is necessary to attain such objectives." (§ 58813.)

Highlighting the term "amendments," appellants argue that section 58813 requires the Department to consider and make findings about any amendment offered as an alternative to the proposed marketing order. We disagree. As the Department argues, "[s]ection 58813's references to amendments simply reflects that the Department is required to follow the same procedures when [amending] a marketing order as when it proposes a new marketing order." (Citing § 59021.) Nothing in section 58813 requires the Department to analyze reasonable alternatives to a marketing order and describe the Department's reasons for rejecting them before promulgating the Marketing Order.[25] (Cf. Gov. Code, § 11346.2, subd. (b)(4)(A).)

The cases cited by appellants are similarly unavailing. Two of the cases, *Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, and *Sims v. Department of Corrections & Rehabilitation* (2013) 216 Cal.App.4th 1059, involved regulations issued under the Administrative Procedure Act (Gov. Code, § 11346 et seq.), which, unlike the CMA, requires agencies to include a description of reasonable alternatives to the proposed regulation and the agency's reasons for rejecting them.

---

[25] Moreover, even if the Department was required to consider *amendments* to the Marketing Order and explain its reasons for rejecting them, the record shows that it did so.

(Gov. Code, § 11346.2, subd. (b)(4)(A).) But marketing orders are expressly exempt from the requirements of the Administrative Procedure Act. (*Voss, supra*, 46 Cal.App.4th at pp. 904, 911.) Thus, the cases cited by appellants have no application here.

The other case cited by appellants, *California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, involved wage and hour orders issued under the Labor Code, which requires "a statement as to the basis upon which an adopted or amended order is predicated." (Lab. Code, § 1177.) In defining a "statement of basis" to support a wage and hour order, our Supreme Court explained that a statement must describe "how and why the commission did what it did." (*California Hotel, supra*, at p. 213.) Where a wage and hour order turns on factual issues, the statement must demonstrate support in the record, and where the order turns on policy choices, the statement must discuss the risks, alternatives, economic and social consequences, where appropriate, and show how the commission resolved the conflicts in adopting the orders. (*Id*. at p. 214.) The CMA imposes no similar requirement here. (*Voss, supra*, 46 Cal.App.4th at p. 917 [the CMA does not "compel [the Department] to disclose the reasoning underlying [its] findings . . . or to explain why the particular order was selected over some other suggested version, if any"]; § 58813.)

The action of the Department in issuing a marketing order under the CMA is quasi-legislative in nature. (*Brock v. Superior Court, supra*, 109 Cal.App.2d at p. 597.) Courts exercise limited review of such acts out of deference to the separation of powers between the Legislature and the judiciary and to the presumed expertise of the agency within the scope of its authority. (*Western Oil & Gas Assn. v. Air Resources Board* (1984) 37 Cal.3d 502, 509.) Under the CMA, the Department was not required to consider reasonable alternatives to the Marketing Order and make findings as to why they

were rejected. Accordingly, the trial court properly rejected appellants' argument that the Marketing Order was invalid due to the Department's failure to consider alternatives.[26]

VII

*Free Speech and Free Association*

In their complaint, appellants alleged that the Marketing Order violated their free speech and free association rights by compelling them to associate with the Board and subsidize the Board's commodity advertising activities. Relying on the United States Supreme Court's decision in *Johanns, supra*, 544 U.S. 550, and this court's decision in *Gallo Cattle, supra*, 159 Cal.App.4th 948, the trial court rejected appellants' free speech/association claims, concluding that the Board's commodity advertising is government speech, and therefore appellants could be compelled to subsidize the speech without violating the First Amendment.

After the trial court's ruling, our Supreme Court decided *Delano Farms Co. v. California Table Grape Com.* (2018) 4 Cal.5th 1204 (*Delano Farms*), which followed *Johanns* in concluding that mandatory assessments by the California Table Grape Commission to fund generic advertising of table grapes did not violate the free speech rights of growers and shippers because the Commission's promotional messages qualified as government speech. (*Id.* at pp. 1209-1211, 1236-1244.) Appellants concede that *Delano Farms* controls resolution of their claims, but they nevertheless raise the argument to "preserve their rights . . . in the event that the U.S. Supreme Court reverses the [*Delano Farms*] opinion."

In November 2018, shortly after appellants filed their opening brief, the United States Supreme Court denied review of *Delano Farms*. (*Delano Farms Co. v. Cal. Table*

---

[26] This claim also is properly denied on procedural grounds since it was not alleged in appellants' complaint. (*Centex Homes v. Superior Court* (2013) 214 Cal.App.4th 1090, 1102.)

*Grape Com.* (2018) ___U.S.___ [202 L.Ed.2d 403].)  Thus, the California Supreme Court's decision in *Delano Farms* is final and binding.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

We accept appellants' concession that *Delano Farms* is controlling and dispositive of their free speech/association claims.  Although there are differences between the marketing program at issue in *Delano Farms* and the program at issue here, we are persuaded that the similarities considerably outweigh the differences.  As in *Delano Farms*, the Board was created by the Legislature to implement public policy by aiding the producers of an agricultural commodity.  (§§ 58651-58654, 58852.)  As in *Delano Farms*, the Legislature authorized the Board to promote the sale of the commodity through generic advertising funded by compelled assessments on the producers.  (§§ 58889, 58921, 58925, 58926, 58929.)  Further, as in *Delano Farms*, the Legislature has specified, in general terms, the basic message for such promotional campaigns, while leaving the details to be fleshed out by the Board, subject to Department oversight.  (§§ 58652, 58813.)  Finally, as in *Delano Farms*, the Legislature has ensured that the Department retains sufficient responsibility and control over the content of the Board's messaging for it to qualify as government speech, even if the Department staff did not review "every word" of the promotional materials.  (§§ 58711, 58841, 58846, 58923, 59081, 59082, 59201, 59240; *Delano Farms, supra*, 4 Cal.5th at p. 1242.)  Accordingly, we follow *Delano Farms* in concluding that the Board's advertising program is government speech and therefore did not violate appellants' free speech or free association rights.  (*Delano Farms, supra*, 4 Cal.5th at pp. 1211, 1236-1244; see also *Gallo Cattle, supra*, 159 Cal.App.4th at p. 952; *Delano Farms Co. v. Cal. Table Grape Com.* (9th Cir. 2009) 586 F.3d 1219, 1220.)

## DISPOSITION

We modify the judgment in the Lion case (C086205) to dismiss the Lion appellants' "varietal benefit" and "non-disparagement" claims due to their failure to

exhaust administrative remedies.  As modified, we affirm the judgment.  The appeal in the Raisin Valley case (C086206) is dismissed.  The Department shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


                                                   KRAUSE          , J.


We concur:


      BLEASE          , Acting P. J.


        HULL            , J.